Gamal ABDEL–HAFIZ, Appellant

v.

ABC, INC., ABC News, Inc., ABC News Holding Company, Inc., Charles Gibson, Brian Ross, Robert Wright, and John Vincent, Appellees.

No. 2–06–244–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 15, 2007.

494

Jeffrey N. Kaitcer, Mike Windsor, Fort Worth, for Appellant.

Todd W. Hutton, Forney, for Appellees.

PANEL A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

On the court's own motion, we withdraw the opinion and judgment dated August 31, 2007 and substitute the following.

In two issues, appellant Gamal Abdel–Hafiz appeals the trial court's orders granting summary judgment in favor of appellee ABC[1] and dismissing appellees Robert Wright and John Vincent for want of jurisdiction. We affirm.

## BACKGROUND

Appellant, born and educated in Egypt, came to the United States ("U.S.") to work in 1984 and became a U.S. citizen in March 1990. He became a language specialist with the Federal Bureau of Investigation

("FBI") in January 1994 and then a special agent in the Dallas FBI office. He was assigned to the Dallas FBI office's international terrorism unit from 1996 to 2001 and served as assistant legal attache to the U.S. Embassy in Saudi Arabia from 2001 to 2003. He was recalled from Saudi Arabia by the FBI in February 2003 for an administrative inquiry into insurance fraud allegations made by his ex-wife. This investigation led to his termination; the FBI later reinstated him.

■ The alleged defamation involves statements made by Wright and Vincent of the FBI's terrorist unit in Chicago and assistant U.S. attorney Mark Flessner, also based in Chicago, about Appellant's reaction to a request that he consensually monitor, that is, wear a wire while interviewing, a Muslim suspect in a 1999 FBI investigation, and by FBI agent Barry Carmody, of the FBI's terrorism unit in Tampa, with regard to a similar request in 1998. Wright and Vincent gave taped interviews on December 9, 2002 for ABC's nationally televised *Primetime Thursday* broadcast ("Broadcast") and a related internet article ("Article"). Carmody and Flessner also gave taped interviews to ABC. ABC published the Broadcast and the Article on December 19, 2002. Appellant specifically complains of the following statements ("Challenged Statements") on appeal.[2]

### Challenged Broadcast Statements

*Broadcast Statement One:* Charles Gibson: "See if this gets your attention."

---

1. We refer to ABC, Inc., ABC News, Inc., ABC News Holding Company, Inc., Charles Gibson, and Brian Ross as "ABC" except where otherwise noted.

2. In his first amended petition and in his supplemental petition, Appellant challenged additional statements. However, the statements quoted in this opinion are the only

statements that Appellant has challenged on appeal. In his appellate brief, Appellant attempted to add additional statements not contained within his first amended petition and supplemental petition, but we will not consider these new statements because they were not brought before the trial court. *See* TEX. R.APP. P. 33.1.

"Or how about this? A Muslim FBI agent accused of refusing orders to secretly record another Muslim suspected of terrorist connections."

*Broadcast Statement Two:* Wright: "September 11th is a direct result of the incompetence of the FBI's International Terrorism Unit. No doubt about that. Absolutely no doubt about that." Brian Ross: "Perhaps most astounding of the many mistakes, according to Flessner and affidavits filed by Agent Wright, is how another FBI Agent who is Muslim seriously damaged the investigation, telling Wright and Vincent he would refuse to secretly record one of Kadi's suspected associates who was also Muslim." [3]

*Broadcast Statement Three:* Wright: "A Muslim doesn't record another Muslim."

*Broadcast Statement Four:* Brian Ross: "Far from being reprimanded, the FBI promoted the Muslim agent to one of its most important anti-terrorism posts at the American Embassy in Saudi Arabia, handling sensitive investigations for the FBI in the Muslim country."

With regard to the Challenged Statements in the Article, Appellant merely states that the Article "contains many of the same statements as the Primetime Thursday Broadcast, but also provides Appellant's name." Therefore, we will only consider the Article statements that Appellant complained of in his first amended and supplemental petitions and that are duplicated in the Broadcast.

*Challenged Article Statements*

*Article Statement One:* "... FBI Agent named Gamal Abdel–Hafiz seriously damaged the investigation."

*Article Statement Two:* "Wright says Abdel–Hafiz, who is Muslim, refused to secretly record one of Al–Kadi's suspected associates, who was also Muslim. Wright says Abdel–Hafiz told him, Vincent, and other agents that 'a Muslim doesn't record another Muslim.'"

*Article Statement Three:* "... Abdel–Hafiz told him, Vincent and other agents that 'a Muslim doesn't record another Muslim.'" [4]

Appellant also listed the following phrases in his supplemental petition and addresses them on appeal: "... allegations that a Muslim FBI agent may have thwarted the investigation two years before ... September 11, 2001," and "Gamal Abdel–Hafiz, a Muslim FBI Agent, refused to cooperate with an FBI probe into BMI, Inc.,...." These phrases are from ABC's November 26, 2002 article entitled, "Dirty Dozen: The FBI May Have Dragged Its Feet on Investigating the Saudi Money Trail" ("November Article"). ABC addressed the November Article in its motion for summary judgment, arguing that Appellant's claims on these phrases were barred by the one-year statute of limitations because Appellant filed his lawsuit on December 17, 2003. Appellant also addresses, with regard to the issue of actual malice, ABC's selection of material and its "decision to juxtapose" allegations involving him with a photo and voice over regarding the September 11, 2001 ("9/11") terrorist attacks.

Appellant sued ABC, Disney Enterprises, Inc., WFAA–TV, L.P., WFAA of Texas, Inc., Belo Corp., Charles Gibson, Brian Ross, Wright, and Vincent for libel per se, slander per se, libel per quod, slander per

---

**3.** Appellant treats these as separate statements in his appellate brief, but he set them out in his supplemental petition as one statement.

**4.** Article Statement Three merely duplicates a portion of Article Statement Two. Therefore, we will not address it separately.

quod, statutory libel, libel and slander by innuendo and implication, and the omission of material facts and juxtaposition of facts in a material way such that the gist of the Broadcast and the Article was false.[5] Brian Ross is the ABC News chief investigative correspondent responsible for the Broadcast, and co-author of the Article. Charles Gibson is the ABC news anchor who read the Broadcast introduction. Appellant sought $3.5 million in compensatory damages plus exemplary damages.[6]

The trial court granted Disney Enterprises, Inc.'s special appearance and dismissed the claims against Belo Corp., WFAA–TV, L.P., and WFAA of Texas, Inc. Wright, an Indiana resident, and Vincent, an Illinois resident, also specially appeared. After a hearing, the trial court dismissed Appellant's claims against Wright and Vincent for want of jurisdiction. The trial court sustained many of ABC's objections to Appellant's summary judgment evidence, which Appellant does not appeal, and granted summary judgment for ABC after a hearing.

## SPECIAL APPEARANCE

In his second issue, Appellant complains that the trial court erred by granting Wright and Vincent's special appearances, claiming that their affidavits did not support their special appearances and that personal jurisdiction was appropriate in Texas because "the allegedly libelous statements concerned the Texas activities of a Texas FBI agent, and the brunt of the harm was to Appellant in Texas."

Appellant sued Wright and Vincent for defamation pertaining to their statements in the ABC interview, Wright's statements made at a May 2002 Judicial Watch press conference in Washington and in a November 2002 *Wall Street Journal* article,[7] and Vincent's statements made in interviews with PBS *Frontline* in March 2000 and CBS 11 in Dallas and the *Dallas Morning News* in March 2003. On appeal, Appellant addresses personal jurisdiction only with regard to the statements from the ABC interview. Therefore, we will address the trial court's orders on Wright and Vincent's special appearances only with regard to the ABC interview.[8] *See* Tex.R.App. P. 38.1(e), 47.1.

### *Standard Of Review*

The trial court's orders sustaining Wright and Vincent's objections to ju-

---

5. We refer to this last claim as Appellant's "juxtaposition claim." *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (holding that a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way).

6. The underlying facts of this case are substantially the same as another lawsuit filed in the 96th District Court of Tarrant County, Texas, in that they both involve defamation suits brought by Appellant against media entities. *See Fox v. Abdel–Hafiz*, 240 S.W.3d 524, 2007 WL 3408635 (Tex.App.-Fort Worth 2007, no pet. h.). The parties in both suits made a rule 11 agreement providing that de-

positions from either case could be used in both cases. *See* Tex.R. Civ. P. 11.

7. At the Judicial Watch press conference in May 2002, Wright made public his redacted EEOC statement which makes reference to a "Muslim FBI agent." (The EEOC statement will be discussed later in this opinion.) The *Wall Street Journal* article, entitled, "Muslim FBI Agent is Accused of Not Taping Terror Suspects," was published on November 26, 2002.

8. Appellant's testimony at the special appearance hearing addressed only the ABC Broadcast. Nothing in the record contradicts the assertions made by Wright and Vincent in their affidavits with regard to the other publications. *See* Tex.R. Civ. P. 120a(3).

risdiction stated that, "having considered the pleadings, evidence, and arguments of counsel," it did not have personal jurisdiction over them. Whether a trial court has personal jurisdiction over a defendant is a question of law reviewed de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 793–94 (Tex.2002); *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 845 (Tex.App.-Fort Worth 2006, no pet.); *SITQ, E.U., Inc. v. Reata*, 111 S.W.3d 638, 644 (Tex.App.-Fort Worth 2003, pet. denied). The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software*, 83 S.W.3d at 793; *TravelJungle*, 212 S.W.3d at 845; *Reata*, 111 S.W.3d at 644. Here, Appellant met his initial burden by asserting that Wright and Vincent had constitutionally sufficient minimum contacts related to his defamation claims under section 17.042 of the civil practice and remedies code, because the claims arose "out of torts committed in whole or in part in [Texas]." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). Appellant contended to the trial court that the ABC interview was "directed to viewers in Texas, as that is where [Appellant] was employed and where [Appellees] knew that [Appellant's] co-workers would see and read the false, libelous, and defamatory statements." He asserted that Wright and Vincent "knew their comments to the media were false, defamatory, and libelous and directed to cause damage to [Appellant] and his professional reputation in Texas" and that their conduct was specifically directed to injure and harm him where "[his] permanent residence has been at all relevant times."

■ A nonresident defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *BMC Software*, 83 S.W.3d at 793; *TravelJungle*, 212 S.W.3d at 845; *Reata*, 111 S.W.3d at 644. We review all of the evidence in making this determination. *TravelJungle*, 212 S.W.3d at 845; *Reata*, 111 S.W.3d at 645; *Michel v. Rocket Eng'g Corp.*, 45 S.W.3d 658, 667 (Tex.App.-Fort Worth 2001, no pet.).

### *Personal Jurisdiction*

■ Texas courts may exercise jurisdiction over a nonresident defendant only if the exercise of jurisdiction is authorized by the Texas long-arm statute and comports with state and federal constitutional guarantees of due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007); *BMC Software*, 83 S.W.3d at 795; *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2) (defining "doing business" under long-arm statute as committing a tort in the state). The long-arm statute's broad "doing-business" language allows the statute to "reach as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575.

■ The federal due process test consists of two parts: (1) whether the nonresident defendant purposely established "minimum contacts" in the forum state; and (2) if so, whether the exercise of personal jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985); *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230–31 (Tex.1991). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2

L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005).

A nonresident's contacts with the forum state may give rise to either specific or general jurisdiction. *BMC Software,* 83 S.W.3d at 795–96. Specific jurisdiction exists where the defendant's alleged liability stems from an activity conducted within the forum state. *Id.* at 796. General jurisdiction exists where the defendant made continuous and systematic contacts with the forum state. *Id.* None of the evidence presented to the trial court supported a contention that Wright and Vincent had the continuous and systematic contacts with Texas required for the exercise of general jurisdiction.

A Texas court may assert specific jurisdiction over an out-of-state defendant if the defendant's contact with this state is purposeful and the injury arises from or relates to those contacts. *See Moki Mac,* 221 S.W.3d at 572–73, 576 (considering, in light of *Michiana,* the extent to which a claim must "arise from or relate to" forum contacts to confer specific jurisdiction over a nonresident defendant in a wrongful-death case against an out-of-state rafting outfitter). This "purposeful availment" inquiry has three parts: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. *Id.* at 575; *Michiana,* 168 S.W.3d at 784–85; *see also Rudzewicz,* 471 U.S. at 476 n. 18, 105 S.Ct. at 2184 n. 18; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Fielding v. Hubert Burda Media, Inc.,* 415 F.3d 419, 425 (5th Cir.2005) (stating that specific jurisdiction in suits alleging an intentional tort based on the publication of defamatory material exists for (1) publication with adequate circulation in the forum state, per *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), or (2) an author or publisher who "aims" a story at the state knowing that the "effects" of the story will be felt there, per *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). Appellant asserts that personal jurisdiction over Wright and Vincent is appropriate under *Calder. See Calder,* 465 U.S. at 788–89, 104 S.Ct. at 1486–87.

When specific jurisdiction is alleged, we focus on the relationship among the defendant, the forum, and the litigation. *See Moki Mac,* 221 S.W.3d at 575–76. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be both purposeful contact with Texas and a substantial connection between those contacts and the operative facts of the litigation. *See id.* at 579, 585 (holding that nonresident defendant did have sufficient purposeful contact with Texas but that there was no substantial connection to support the exercise of specific jurisdiction between those contacts, that is, between the rafting company's advertising and the plaintiff's wrongful death claim); *Michiana,* 168 S.W.3d at 781–92 (stating that there was no purposeful contact because nonresident defendant's sale in Texas resulted from the "mere fortuity" that the plaintiff happened to reside here and not from any affirmative efforts by the defendant to solicit business in Texas).

Wright and Vincent made the same arguments in their special appearance motions, contending, among other arguments, that they never identified Appellant or committed a tort in Texas; that they had no minimum contacts with Texas; that

they could not reasonably have foreseen being haled into a Texas court in this matter; and that the alleged cause of action did not arise from any conduct by Wright or Vincent directed at Texas. The trial court sustained Wright and Vincent's objections to Appellant's affidavit.[9] Appellant does not appeal the trial court's ruling.

Wright and Vincent also asserted that the Texas Supreme Court in *Michiana* had expressly disapproved of the "directed a tort" type jurisdiction relied on by Appellant. *See* 168 S.W.3d at 790–92. They attached evidence pertaining to Appellant's sale of his Texas home after his relocation to Saudi Arabia in 2001 and claimed that there was a lack of evidence to show that they knew that Appellant "resided" in Texas during that time. They also attached Appellant's answers to their interrogatories, portions of Appellant's deposition, and the FBI Initial Written Agreement on Appellant's overseas assignment. At the hearing, at Appellant's request, the trial

court admitted the ABC interview, portions of Wright's and Vincent's depositions in which they stated that Appellant was the "Muslim agent" referred to in the ABC interview, and two FBI memoranda establishing that Wright and Vincent knew Appellant was stationed in the Dallas FBI office in 1999.

▆ It is uncontested that neither Wright nor Vincent were Texas residents and that the ABC interview in 2002 took place in Illinois.[10] Appellant's evidence at the hearing established that Wright and Vincent were aware that Appellant was assigned to the Dallas FBI office in 1999. Vincent testified that ABC informed them that Appellant was in Riyadh, Saudi Arabia, "just prior to our interview in December of 2002" and that he had no idea that Appellant might subsequently be recalled to Dallas.[11] Wright testified that he understood that ABC *Primetime* was broadcast nationally.[12]

9. Wright and Vincent had objected that Appellant's affidavit was not based on personal knowledge and failed to set forth specific facts that would be admissible as evidence under rule 120a(3). *See* Tex.R. Civ. P. 120a(3).

10. In his affidavit, Wright averred that he had been a continuous resident of Indiana since 1993, that he had had no purposeful connection with Texas other than incidental travel in 1998 through his employment as an FBI agent, that the ABC interview, conducted in Illinois, had no connection with or focus on Texas, and that he did not divulge Appellant's identity during the interview. Wright stated that the interview was not directed at a Texas audience as apart from an audience of any other state, that it was his understanding at the time of the interview that Appellant was assigned to and residing in Saudi Arabia, that he did not know the exact religious make-up of all agents in the FBI or have the means to acquire knowledge of the number of "Muslim" agents in the FBI, and that he did not travel to Texas in 2003. Wright also stated that the interview included no reference to the state of Texas. However, while the inter-

view did not contain references to Texas, it did contain references to "Dallas."

Vincent made similar averments in his affidavit and added that his trip to Dallas in March 2003 was for a press conference on "a matter wholly unrelated to [Appellant]" and attached the event's press release, entitled, "JUDICIAL WATCH REVEALS TERRORIST FRONT GROUP CONTINUES TO OPERATE IN DALLAS/FORT WORTH, TX," to support this contention.

11. Vincent also testified that he made one trip to Texas in March 2003 for his employer, which "had nothing to do with [Appellant]," supported by the press release attached to his affidavit. The press conference occurred on March 5, 2003. Appellant testified that he returned to Texas from Saudi Arabia on March 14, 2003, and that he was ordered back because of an administrative inquiry by the FBI.

12. Although Appellant asserts, "Wright acknowledged that Appellant was in the Dallas FBI office when he allegedly made the state-

A review of the ABC interview shows that its focus was on the FBI and its activities and problems with regard to terrorism, including Wright and Vincent's backgrounds with the FBI and problems they had with the "upper echelons of [FBI] management." Wright discussed the "Muslim FBI agent" in Dallas in April 1999 as an example of the problems within the FBI.[13] That portion of the interview described what was said during the conference call about the consensual monitoring, Wright and Vincent's reactions, that there had been other problems with the agent with the Washington and Tampa FBI offices, and that the agent filed a discrimination complaint against Wright. Wright also discussed the five-hundred page book he wrote prior to the 9/11 attacks about what the FBI could have done to neutralize terrorists.

Focusing our analysis first on the relationship among the defendants, the forum, and the litigation, the record does not disclose any purposeful contact or connection between Wright and Vincent to Texas, other than that the Dallas FBI office was where Appellant was stationed in 1999 when they sought to have him consensually monitor a Muslim suspect. The record

reflects that Wright believed the broadcast would be nationwide, that Vincent did not believe Appellant was in Dallas when he gave the interview, and that the "Muslim agent" discussion was within the context of problems within the FBI with regard to terrorism investigations. *See Moki Mac*, 221 S.W.3d at 575–76; *see also Fielding*, 415 F.3d at 425–26 (stating that *Calder* jurisdiction requires a case-by-case analysis of the publication's purpose and impact and that, in addition to requiring that the story's "effects" be felt in the forum, the defendant's "aim" must be demonstrated by showing that the article's subject matter, and the sources relied upon for the article, were in the forum state). Wright and Vincent made the allegedly defamatory statements in the ABC interview in Illinois based upon their personal experiences and the statements were then broadcast nationally. There is no evidence in the record to support Appellant's contention that Wright and Vincent directed their statements specifically at Texas or that they did not believe ABC's information that Appellant was in Saudi Arabia. Therefore, we conclude that the trial court correctly determined that it had no personal jurisdiction over Wright and Vincent

ments to Appellee Ross" and that Wright "believed that Appellant was stationed at the Dallas FBI office and that the communications with Appellant were made through the Dallas FBI office," after reviewing the record, we conclude that Appellant's first statement has no support in the record and that the second statement pertains to the communication with Appellant in 1999.

Wright testified that his last contact with Appellant had been in May or June 1999 and that he "would have no reason to know where [Appellant] was after that." Appellant's attorney asked, "Then you wouldn't have any reason to think that he had moved anywhere other than what you were told about him being in Riyadh by . . . ABC and NBC news, is that correct?" Wright replied, "I don't even know how to answer, so I'm not gonna an-

swer it," after his attorney objected to the form of the question.

13. Wright stated that the agent contacted him, told him that the president of the company Wright was investigating wanted to meet with the agent to talk about Wright's investigation, and asked whether Wright wanted the agent to meet with the company president. Wright stated that he said yes, the agent agreed, Wright told the U.S. attorneys about it, and then they found out that "there was considerable resistance on the part of the Muslim agent to wear a wire." He and Vincent talked about the agent's alleged statement, that "[a] Muslim doesn't record another Muslim," and about the fact that FBI headquarters did not respond to their complaints about this.

because there was no purposeful contact with Texas after 1999 by Wright and Vincent to support even an attenuated connection with Appellant's defamation claims pertaining to the 2002 ABC interview. *See Moki Mac,* 221 S.W.3d at 579, 585; *Michiana,* 168 S.W.3d at 791–92; *Fielding,* 415 F.3d at 425–26; *cf. Calder,* 465 U.S. at 785, 788–90, 104 S.Ct. at 1484, 1486–87 (stating that the defamation plaintiff, a California resident and television actress, was the focus of the activities of the Florida defendants in intentionally writing and editing their *National Enquirer* article in which they alleged that she drank so heavily as to prevent her from fulfilling her professional obligations, and that the defendants expressly aimed their actions at California, where they knew their article "would have a potentially devastating impact" on her and where she would bear the brunt of that injury because she lived and worked there and the newspaper had its largest circulation in that state). We overrule Appellant's second issue.

## SUMMARY JUDGMENT

In his first issue, Appellant contends that the trial court erred by granting summary judgment in favor of ABC. Specifically, Appellant argues that there are genuine issues of material fact as to whether the Broadcast and the Article were true (subissue 1) and as to actual malice (subissue 2), that the Broadcast and the Article were not "opinion, rhetoric, or hyperbole" (subissue 3), that his claims regarding the November Article are not barred by limitations (subissue 4), that the "State Secrets Privilege" does not prevent ABC from presenting its case (subissue 5), and that he brought forth adequate evidence to defeat the no-evidence motion (subissue 6). Because they are dispositive, we first address Appellant's second and sixth subissues—did Appellant raise more than a scintilla of probative evidence of actual malice by ABC?

### STANDARD OF REVIEW

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex.2002). When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex. 2006). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX.R. CIV. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002).. If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no evidence summary judgment is not proper. *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied). "Less than a scintilla" exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *King Ranch v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003), *cert. denied,* 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004). "More than a scintilla" exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). A genuine issue of material fact is raised by presenting evidence on which a reasonable

jury could return a verdict in the nonmovant's favor. *Moore,* 981 S.W.2d at 266; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (interpreting FED.R.CIV.P. 56).

Texas Rule of Civil Procedure 166a does not prohibit a party from combining in a single motion a request for traditional summary judgment and a request for no-evidence summary judgment. *See* TEX.R. CIV. P. 166a(c), (i); *Binur v. Jacobo,* 135 S.W.3d 646, 650 (Tex.2004). When, as here, a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the no-evidence standards of rule 166a(i). *Ford Motor Co.,* 135 S.W.3d at 600. If the non-movant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the movant's summary judgment proof satisfied the traditional summary judgment test of rule 166a(c). *Id.*

## DEFAMATION

■ Appellant sued ABC under various defamation theories. To maintain any of his defamation claims, Appellant had the burden to prove that ABC: (1) published a statement; (2) that was defamatory concerning Appellant; (3) while acting with either actual malice, if Appellant was a public official or public figure, or negligence, if he was a private individual, regarding the statement's truth. *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998), *cert. denied,* 526 U.S. 1051, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999). Neither party disputes that ABC published Broadcast Statements One through Four and Article Statements One through Three; ABC did contest publication of the two November Article phrases but admitted in its limitations argument that it published them on November 26, 2002 on its website. Based on the parties' summary judgment pleadings presented to the trial court, we confine our review here to the "actual malice" standard.[14]

## CONSTITUTIONAL "ACTUAL MALICE"

■ A no-evidence summary judgment would be improper only if we conclude, after examining the entire record, that Appellant has presented evidence creating more than a surmise or suspicion that ABC published the statements with actual malice.[15] *See Sudan,* 199 S.W.3d at 292; *King Ranch,* 118 S.W.3d at 751.

14. In his first amended and supplemental petitions, Appellant claimed that he was a private individual. However, in his appellate brief, Appellant merely argues that there is a genuine issue of material fact as to the actual malice of ABC and does not dispute ABC's contention that he is a public figure. Therefore, for purposes of our review, we assume that Appellant was a public official, a public figure, or a limited purpose public figure. *See* TEX.R.APP. P. 38.1(f); *W. Steel Co. v. Altenburg,* 206 S.W.3d 121, 124 (Tex.2006) ("An appellate court normally accepts as true the facts stated in an appellate brief unless the opposing party contradicts them.").

15. To recover for defamation, a public figure suing a media defendant has the burden to prove that defamatory statements made about him were false. *See Bentley v. Bunton,* 94 S.W.3d 561, 586 (Tex.2002). However, as we resolve Appellant's claims here on the issue of whether he raised a genuine issue of material fact as to actual malice, we need not consider whether ABC's Broadcast and Article either expressly or implicitly made false statements about Appellant. *See* TEX.R.APP. P. 47.1. When, as here, the trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex.2003); *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995); *Harwell v. State Farm Mut.*

"Actual malice" in the defamation sense does not include ill will, spite, or evil motive. *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989). Rather, to establish actual malice, the plaintiff must prove that the defendant published a defamatory falsehood "with knowledge that it was false or with reckless disregard of whether it was false or not." *WFAA–TV,* 978 S.W.2d at 571 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)). The actual malice standard's purpose is to protect innocent but erroneous speech on public issues, while deterring "calculated falsehoods." *Turner,* 38 S.W.3d at 120 (citing *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)); *see also New York Times,* 376 U.S. at 270, 84 S.Ct. at 721 (stating that defamation cases must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). To prevail at trial, a public figure plaintiff must establish actual malice by clear and convincing evidence, but the Texas Supreme Court has declined to adopt the clear-and-convincing standard at the summary judgment stage. *Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 420–21 (Tex.2000).

The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—is not readily captured in one infallible definition. *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). And while knowledge of falsity is a relatively clear standard, reckless disregard is much less so. *See, e.g., Bentley,* 94 S.W.3d at 591 (reviewing U.S. Supreme Court

*Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex.

cases on actual malice). Reckless disregard is a subjective standard that requires the plaintiff to bring forth evidence that the defendant entertained serious doubts as to the truth of the publication at the time it was published. *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex.2005); *see also Harte–Hanks Commuc'ns, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989) (stating that reckless disregard involves a "high degree of awareness of probable falsity"); *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325 (stating that there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication). And a publisher's presentation of facts may be misleading, even negligently so, but will not constitute a "calculated falsehood" unless the publisher knows or strongly suspects that it is misleading. *Turner,* 38 S.W.3d at 120.

Actual malice focuses on the defendant's state of mind, particularly his attitude toward the truth of what he reported, which a plaintiff can prove through objective evidence about the publication's circumstances and the defendant's conduct at the time of publication. *Id.; WFAA–TV, Inc.,* 978 S.W.2d at 573; *see also Bentley,* 94 S.W.3d at 591, 596 (stating that defendant's lack of care and motive are factors to consider). When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish that the defendant either knew that the words would convey a defamatory message or had reckless disregard for their effect. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 162 (Tex.2004), *cert. denied,* 545 U.S. 1105, 125 S.Ct. 2557, 162 L.Ed.2d 276 (2005). Publications alleged to be defamatory must be viewed as a whole—

1995).

including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself, and we consider the actual malice issue within this context. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex.2005) (citing *New Times, Inc.*, 146 S.W.3d at 158–59, for the proposition, with regard to a no-evidence assertion, that legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict).

## BROADCAST AND ARTICLE

We have reviewed the Broadcast and the Article and include them here, bolding the portions that contain the alleged defamatory statements. Gibson provided the introductory narration, known as a "voice over," for Ross' story, "The Story the FBI Didn't Want Told." "Voice over" is shortened to "(VO)" in the transcript of the Broadcast and "on camera" is shorted to "(OC)."

### Broadcast

Gibson: (VO) The story the FBI did not want told.

Wright: You can't know the things I know and not go public.

Gibson: (VO) Why were these FBI agents called off the trail of a rich Saudi businessman, suspected of helping to bankroll Osama bin Laden. But wait, it could get worse. The Saudi may own a computer company that creates sensitive software for the FBI itself.

Wright: September 11th is a direct result of the incompetence of the FBI's International Terrorism Unit. No doubt about that.

Gibson: (VO) Tonight, Brian Ross with a major "Primetime" investigation.

. . .

Announcer: Next, explosive allegations. Two FBI Agents step out of the shadows to tell what they know. In the months before September 11th, why were they stopped from pursuing suspected terrorist cells in the Chicago area and told to let sleeping dogs lie?

Wright: Those dogs weren't sleeping. They were training, they were getting ready.

. . .

Gibson: (OC) **See if this gets your attention.** A rich, Saudi businessman, suspected of funneling money to Osama Bin Laden, who is also a suspected owner of a company that creates highly sensitive software for the FBI. **Or how about this, a Muslim FBI Agent accused of refusing orders to secretly record another Muslim suspected of terrorist connections.** [Broadcast Statement One] Well tonight, two FBI Agents come forward to say if all of that worries you, it should. They put everything at risk to give Chief Investigative Correspondent Brian Ross a disturbing account that the FBI has tried to keep secret.

Ross: (VO) 10:00 last Monday morning in Chicago. This was the day. This was the hour. This was the interview FBI headquarters in Washington feared was coming. Two of the FBI's own, Special Agents Robert Wright and John Vincent breaking ranks.

Wright: You can't know the things I know and not go public.

Ross: (VO) Finally telling the story they say the FBI has tried to keep secret from Congress and the American public.

Wright: **September 11th is a direct result of the incompetence of the FBI's International Terrorism Unit.**

**No doubt about that. Absolutely no doubt about that.** [Part of Broadcast Statement Two]

Ross: (OC) You're an FBI agent and you're saying that about the FBI?

Wright: I know that. Yes.

Ross: (VO) It's a long way from the day 12 years ago when, as a law school graduate from Indiana, Robert Wright took the oath to become an agent of the FBI.

Wright: To protect America from all enemies, foreign and domestic.

Ross: (OC) And you think you tried to do that?

Wright: Others tried to stop me but I tried to do that.

Ross: (VO) Wright's partner, John Vincent, joined the FBI 27 years ago. A young lawyer from South Dakota who would become one of the Bureau's most seasoned street agents before retiring a few days after this interview.

Vincent: Truthfully, if 9/11 had not occurred we wouldn't be here.

Ross: (OC) Really?

Vincent: Because of 9/11, we're here. Because we see the danger.

Ross: (VO) Their story begins in the mid–1990s. With growing terrorism in the Middle East, the two agents were assigned to track a connection to Chicago, a suspected terrorist cell that would later lead them to an Osama Bin Laden connection.

[While Ross narrates, stock footage of results of a terrorist attack shows injured persons and resulting chaos.]

Wright: We had a cell in Chicago, right. And that was, that was the premise of how we got the investigation going.

Ross: (VO) But Wright says he soon discovered that all the FBI Intelligence Division wanted him to do was to follow suspected terrorists around town and file reports, but make no arrests.

Wright: The supervisor who was there from headquarters was right straight across from me and started yelling at me, "[Y]ou will not open criminal investigations. I forbid any of you. You will not open criminal investigations against any of these intelligence suspects."

Ross: (OC) You're on the Terrorism Task Force and you were told you will not open criminal cases?

Wright: Yes.

Ross: (VO) In 1998, Al–Qaeda terrorists bombed two American Embassies in Africa, killing more than 200 people. The agents say some of the money for the attack led back to the people they had been tracking in Chicago, and to a powerful Saudi Arabian businessman, this man, Yassin Kadi, who had extensive business and financial ties in Chicago. Yet, even after the bombings, the agents say headquarters ordered no arrests.

[While Ross narrates, a stock clip of the 1998 U.S. Embassy bombings, showing bodies and wreckage plays, followed by a photograph of Kadi.]

Wright: Two months after the embassies are hit in Africa, they want to shut down the criminal investigation. They wanted to kill it.

Ross: (VO) The move outraged the Federal Prosecutor in Chicago, who says Agents Wright and Vincent were helping him build a strong criminal case against Kadi and others.

[While Ross narrates this portion, what appears to be a federal building is shown, with an American flag waving outside in the breeze.]

Flessner: There were powers bigger than I was in the Justice Department and within the FBI that simply were not going to let it happen. And it didn't happen.

Ross: Mark Flessner, now in private practice, says he still can't figure out why Washington stopped the case, whether it was Saudi influence or bureaucratic ineptness.

Flessner: I think there were very serious mistakes made. And I think it, perhaps, cost, it cost people their lives, ultimately.

Ross: (VO) **Perhaps the most astounding of the many mistakes, according to Flessner and affidavits filed by agent Wright is how another FBI agent who is Muslim seriously damaged the investigation. Telling Wright and Vincent, he would refuse to secretly record one of Kadi's suspected associates who was also Muslim.** [Remainder of Broadcast Statement Two]

[While Ross narrates, a close-up of Wright's redacted EEOC statement is shown.]

Wright: **A Muslim doesn't record another Muslim.** [Broadcast Statement Three] Right out of his own mouth. Five of us, six of us heard it.

Vincent: He wouldn't have any problems interviewing or recording somebody who wasn't a Muslim but he could never record another Muslim.

Ross: (OC) What do you make of that? Thinking back to the oath you took as an FBI Agent?

Wright: I was floored. I went back upstairs and I called FBI headquarters to tell them what had just happened. And the supervisor from headquarters says, "Well, you have to understand where he's coming from, Bob." I said, "no, no, no, no. I un-derstand where I'm coming from. We both took the same damn oath to defend this country against all enemies foreign and domestic and he just said no? No way in hell."

Ross: (VO) **Far from being reprimanded, the FBI promoted the Muslim agent to one of its most important anti-terrorism posts, at the American Embassy in Saudi Arabia, handling sensitive investigations for the FBI in that Muslim country.** [Broadcast Statement Four]

[While Ross narrates, a stock video clip of a minaret is shown around sunset with the muezzin's call to prayer playing in the background. This clip is followed by a video clip of the U.S. Embassy in Riyadh, Saudi Arabia.]

Ross: (OC) The FBI says when it sent the Muslim agent to Saudi Arabia, it was unaware of the allegations or of two other similar incidents described to "Primetime" by FBI agents in New York and in Tampa.

Ross: (VO) In a statement to "Primetime," the FBI also defends the agent as making significant contributions, saying he had a right to refuse because the undercover recording was supposed to take place in a mosque. That's a complete lie, according to former prosecutor Flessner, who says a mosque was never part of the plan and that the FBI is covering up.

[While Ross narrates, a close-up of the official FBI statement is shown with the words "meeting in a mosque" highlighted.]

Flessner: What he said was it was against his religion to record another Muslim. I was dumbfounded by that response.

Ross: (VO) As to Wright, the FBI says the decision to kill his case was appropriate at the time. Something Wright

continued to protest to his supervisor through early 2001.

Wright: You know what his response was? "I think it's just better to let sleeping dogs lie." This is January of 2001.

Ross: (OC) January 2001? Let sleeping dogs lie.

Wright: Those dogs weren't sleeping, they were training, they were getting ready.

Ross: (VO) On September 11th, the two agents watched in horror worried that men they could have stopped years earlier were involved. And now, the White House says they were. One month after the attacks, the U.S. government officially identified Yassin Al Kadi as one of Osama Bin Laden's important financiers, a specially designated global terrorist, the same man, who years earlier, the FBI had ordered agents Vincent and Wright to leave alone.

[At the beginning of Ross' narration here, a photograph of the Twin Towers in New York on September 11th, with smoke from the first strike and the second plane on approach is shown. This is followed by a close-up of a statement from the U.S. government about Yassin Kadi, and Kadi's photograph.]

Ross: (OC) No surprise to you?

Wright: No.

Vincent: No, there's no surprise there.

Wright: We knew. Yeah.

Ross: (VO) Kadi, a multimillionaire with ties to the Saudi Royal Family, tells ABC News he can prove his total [i]nnocence, repeatedly denying from his office in Riyadh, any connection to Osama Bin Laden or Al Qaeda.

[While Ross narrates, a video clip of a Yassin Kadi interview is shown.]

Kadi: Not even one cent went to Osama Bin Laden.

Ross: (VO) But just this month Kadi was back in the news, as agents, not FBI agents, but U.S. customs agents conducted a midnight search of a Boston company believed to be secretly owned and controlled by Kadi. The company, it turns out, provides computer software to the FBI and other Federal agencies, which means Kadi and his employees could have had access to some of the government's most sensitive secrets. In a vindication of what FBI agent Wright has been saying all along, the Federal government now says it is pursuing possible criminal charges against Yassin Kadi.

[While Ross narrates, a video clip of what appears to be U.S. customs agents carrying out computer components is played.]

Wright: And there's, there's so much more. God, there's so much more.

Sawyer: (OC) The Bush Administration could hear from the agents yet. They say they're ready, if called, to testify before the newly appointed independent commission investigating why no one stopped the 9/11 terrorists in time.

*Article*

Ross and Vic Walter co-authored the Article, entitled, "Called Off the Trail? FBI Agents Probing Terror Links Say They Were Told, 'Let Sleeping Dogs Lie.'" The blurb beneath the byline with the authors' names states, "Dec. 19—Two veteran FBI investigators say they were ordered to stop investigations into a suspected terror cell linked to Osama bin Laden's al Qaeda network and the Sept. 11 attacks." The text of the Article follows; the Challenged Statements are bolded.

In a dramatic interview with ABCNEWS, FBI special agents and part-

ners Robert Wright and John Vincent say they were called off criminal investigations of suspected terrorists tied to the deadly bombings of two U.S. embassies in Africa. U.S. officials say al Qaeda was responsible for the embassy attacks and the Sept. 11, 2001, attacks in the United States.

"September the 11th is a direct result of the incompetence of the FBI's International Terrorism Unit. No doubt about that. Absolutely no doubt about that," Wright said. "You can't know the things I know and not go public."

In the mid–1990s, with growing terrorism in the Middle East, the two Chicago-based agents were assigned to track a connection to Chicago, a suspected terrorist cell that would later lead them to a link with Osama bin Laden. Wright says that when he pressed for authorization to open a criminal investigation into the money trail, his supervisor stopped him.

"Do you know what his response was? 'I think it's just better to let sleeping dogs lie,'" said Wright. "Those dogs weren't sleeping. They were training. They were getting ready." The FBI says its handling of the matter was appropriate at the time.

"Truthfully, if 9/11 had not occurred we wouldn't be here [giving the interview]," said Vincent, a 27–year veteran at the bureau until he retired a few days after being interviewed by ABCNEWS. "Because of 9/11, we're here because we see the danger."

'You Will Not Open Criminal Investigations'

The suspected terrorist cell in Chicago was the basis of the investigation, yet Wright, who remains with the FBI, says he soon discovered that all the FBI intelligence division wanted him to do was to follow suspected terrorists and file reports—but make no arrests.

"The supervisor who was there from headquarters was right straight across from me and started yelling at me, 'You will not open criminal investigations. I forbid any of you. You will not open criminal investigations against any of these intelligence suspects,'" Wright said.

Even though they were on a terrorism task force and said they had proof of criminal activity, Wright said he was told not to pursue the matter.

In 1998 al Qaeda terrorists bombed two American embassies in Africa. The agents say some of the money for the attacks led back to the people they had been tracking in Chicago and to a powerful Saudi Arabian businessman, Yassin al-Kadi. Al–Kadi is one of 12 Saudi businessmen suspected of funneling millions of dollars to al Qaeda and who had extensive business and financial ties in Chicago.

Yet, even after the bombings, Wright said FBI headquarters wanted no arrests.

"Two months after the embassies are hit in Africa, they wanted to shut down the criminal investigations," said Wright. "They wanted to kill it."

The move outraged Chicago federal prosecutor Mark Flessner, who was assigned to the case despite efforts Wright and Vincent say were made by superiors to block the probe. Flessner said Wright and Vincent were helping him build a strong criminal case against al-Kadi and others.

"There were powers bigger than I was in the Justice Department and within the FBI that simply were not going to let it [the building of a criminal case] happen. And it didn't happen," Flessner said.

He said he still couldn't figure out why Washington stopped the case—whether it was Saudi influence or bureaucratic ineptitude.

"I think there were very serious mistakes made," said Flessner. "And I think, it perhaps, cost, it cost people their lives, ultimately."

Muslim Agent Refused to Record Fellow Muslim, Agent Says.

Perhaps most astounding of the many mistakes, according to Flessner and an affidavit filed by Wright, is how an **FBI agent named Gamal Abdel–Hafiz seriously damaged the investigation.** [Article Statement One] **Wright says Abdel–Hafiz, who is Muslim, refused to secretly record one of al-Kadi's suspected associates, who was also Muslim. Wright says Abdel–Hafiz told him, Vincent, and other agents that "a Muslim doesn't record another Muslim."** [Article Statement Two/Article Statement Three]

"He wouldn't have any problems interviewing or recording somebody who wasn't a Muslim, but he could never record another Muslim," said Vincent. Wright said he "was floored" by Abdel–Hafiz's refusal and immediately called the FBI headquarters. Their reaction surprised him even more: "The supervisor from headquarters says, 'Well, you have to understand where he's coming from, Bob.' I said, 'no, no, no, no, no. I understand where I'm coming from,[']" said Wright. "We both took the same damn oath to defend this country against all enemies foreign and domestic and he just said no? No way in hell." Far from being reprimanded, Abdel–Hafiz was promoted to one of the FBI's most important anti-terrorism posts, the American Embassy in Saudi Arabia, to handle investigations for the FBI in that Muslim country.

The FBI said it was unaware of the allegations against the Muslim agent when he was sent to Saudi Arabia or of two similar incidents described to ABCNEWS by agents in New York and Tampa, Fla. They said Abdel–Hafiz contributed significantly to many successful terror investigations.

In a statement to ABCNEWS, the FBI also defended the agent, saying he had a right to refuse because the undercover recording was supposed to take place in a mosque.

But former prosecutor Flessner said that was a lie and the mosque was never part of the plan.

"What he [Abdel–Hafiz] said was, it was against his religion to record another Muslim. I was dumbfounded by that response," said Flessner. "And I had perfectly appropriate conversations with the supervisors of his home office and nothing came of it."

Closing In on Bin Laden Money Trail.

On Sept. 11, 2001, the two agents watched the terror attacks in horror, worried that men they could have stopped years earlier may have been involved.

The White House confirmed their fears. One month after the attacks, the U.S. government officially identified al-Kadi—the same man the FBI had ordered Wright and Vincent to leave alone years earlier—as one of bin Laden's important financiers.

Al–Kadi told ABCNEWS he can prove his total innocence, repeatedly denying, from his office in Riyadh, any connection to Osama bin Laden or al Qaeda.

"Not even one cent went to Osama bin Laden," he said.

But on Dec. 6, U.S. Customs agents, as part of their own investigation, conducted a midnight search of a Boston-area

company believed to be secretly owned and controlled by al-Kadi.

The company provides computer software to the FBI and other key federal agencies, which means al-Kadi and his employees could have had access to some of the government's most sensitive secrets.

Al–Kadi is on the U.S. government's "dirty dozen" list of leading terror financiers being investigated by the CIA. The federal government says it is pursuing possible criminal charges.

"I was relieved that Customs was picking it up ... where we failed big time," said Wright. "There's so much more. God, there's so much more. A lot more."

We will discuss the pertinent portions of the November Article below, rather than set it out in its entirety here.

### APPELLANT'S CLAIMS

Appellant makes the following contentions with regard to ABC's Broadcast and Article: (1) that ABC made and published statements that it knew were substantially false, that is, published the statements with actual malice; and (2) that ABC chose its material with actual malice and omitted material facts and juxtaposed facts in a material way such that the gist of the Broadcast and the Article was false.[16]

### (1) Challenged Statements

As we have already overruled Appellant's seventh issue, pertaining to Wright and Vincent's special appearances, we do not address the truth or falsity of their statements within the Broadcast and the Article or whether they made those statements with actual malice. See TEX.R.APP. P. 47.1. Instead, we review whether there is evidence in the record to show that, between the taping of Wright and Vincent's interview on December 9, 2002 and ABC's publication of the Broadcast and the Article on December 19, 2002, ABC either knew that Wright and Vincent's statements, including part of Broadcast Statement Two and Broadcast Statement Three, and all of the Article statements were false or that ABC had serious doubts about whether those statements were true. We will review the remaining statements, Broadcast Statement One, part of Broadcast Statement Two, and Broadcast Statement Four, which were directly attributed to ABC and its employees, under the same actual malice standard.

Appellant contends that there is substantial evidence that ABC "knew that Appellant was not ordered to engage in the recording, knew that Appellees Wright and Vincent could not order Appellant to engage in the recording, or knew that Appellant was not accused of disobeying an order to engage in the recording when [ABC] had no information to support its statements." Appellant specifically asserts that the Challenged Statement made by Gibson, Broadcast Statement One, was made with actual malice.

With regard to evidence that ABC knew the Challenged Statements were false or had serious doubts with regard to their truth, we look to the evidence in the record pertaining to the state of mind of ABC's reporters, researchers, and related staff at the time that the Broadcast and Article

---

**16.** In his first amended and supplemental petitions, Appellant also contended that ABC acted with actual malice by purposefully avoiding the truth. However, Appellant did not raise this issue in his appellate brief. *See*

TEX.R.APP. P. 38.1(e); *Weaver v. Sw. Nat'l Bank*, 813 S.W.2d 481, 482 (Tex.1991) (stating that an appellate brief must contain all issues relied upon).

were published.[17]

*Gibson's Statement And ABC's Knowledge Pertaining To "Orders"*

██ The portion of Broadcast Statement One at issue is Gibson's phrase, "A Muslim FBI agent accused of refusing *orders* to secretly record another Muslim suspected of terrorist connections." [Emphasis added.] Appellant calls Broadcast Statement One "the most striking false statement" because "[t]here is no question ... that an *order* as to whether or not Appellant was to engage in consensual monitoring could only have come from Dallas SAC [Danny] Defenbaugh." [Emphasis added.]

Gibson states in his affidavit that on December 19, 2002, he was an anchor on ABC's *Primetime Thursday* program, that he did not have any involvement in the research or preparation of the Broadcast script or the Article, and that at the time of publication, he believed all of the statements contained in the Broadcast and Article to be true and did not entertain any doubts about their truth. There is no evidence in the record that Gibson did any of the research or preparation for the portion of the Broadcast pertaining to Wright, Vincent and the FBI.[18] To the contrary, however, Ross, a journalist with thirty-five years of experience, stated in his affidavit

that he and Vic Walter were responsible for both the Broadcast and the Article. Nothing in the record indicates that Gibson did anything more than read Broadcast Statement One aloud. Therefore, unless there is any evidence in the record to show that either Ross or Walter believed Broadcast Statement One was false or had serious doubts about its truth and that one of them conveyed this information to Gibson, there is no genuine issue of material fact with regard to Gibson and actual malice.

Ross and Walter stated in their affidavits that, at the time the Broadcast and the Article were published, they believed all of the statements within were true and that they did not entertain any doubt, serious or otherwise, about their truth. Ross detailed the process by which he and Walter conducted their research and preparation for the Broadcast and Article.[19] Ross stated that they interviewed Flessner, Wright, Carmody, and Vincent, as well as a former FBI agent, Jack Cloonan. The Flessner, Wright, Carmody, and Vincent interviews were all videotaped and the transcripts are included in the record.

Ross stated that they attempted to interview Appellant, contacting him at the embassy in Saudi Arabia in early December 2002. The e-mail from Richen to Appellant, requesting an interview for *Prime-*

---

**17.** Specifically, although we review the entire voluminous record with regard to a no evidence summary judgment, we will only discuss the pertinent evidence, such as the affidavits of Ross, Gibson, and Walter; the depositions of Ross and Walter; the email sent to Appellant by Yoruba Richen, an ABC associate producer, requesting an interview for *Primetime Thursday;* the letter sent by Jill Rackmill, another ABC producer, to FBI's Ed Cogswell prior to publication, requesting an on-camera interview with FBI Director Robert Mueller about the issues raised by Wright, Vincent, and Flessner in their interviews; the FBI official statement sent to ABC; and transcripts of the ABC

interviews with Flessner, Carmody, Wright, and Vincent.

**18.** Gibson also read the voice over for a story on lighted billboards during the program's introduction but the remainder of the Broadcast that does not involve Wright, Vincent, or the FBI is not in the record.

**19.** Ross testified that his job duties as chief investigative correspondent for ABC News were to develop and report stories for *Good Morning America, World News Tonight, Nightline, Primetime,* and *20/20,* as well as ABC Radio and the abcnews.com website.

*time Thursday,* is included in the record.[20] Ross further stated that ABC was informed that Appellant was not willing to give an on-camera interview to ABC and would not provide them with a written or oral comment, that they interviewed other FBI representatives for background "off the record," and that the FBI provided ABC with an official statement.[21] The FBI's official statement is also included in the record, as is Rackmill's letter informing the FBI about Wright, Vincent, Flessner, and Carmody's allegations about Appellant and requesting a response.

Ross stated that he and Walter "reviewed a number of documents" in their preparation for the Broadcast and the Article, and that these documents included, but were not limited to, the following: (a) Wright's affidavit filed in support of Operation Vulgar Betrayal's civil forfeiture application;[22] (b) Wright's sworn EEOC statement responding to Appellant's discrimination complaint; and (c) Wright's performance evaluation during the time that Appellant allegedly made his refusal to record a terrorism suspect. All of these documents are included in the record. Ross testified that he considered Cloonan, Flessner, Wright, Vincent, and Carmody to be credible.

Ross stated that he was aware that the allegations made about Appellant by Wright, Vincent, and Carmody had been made public at a nationally televised press conference several months after September 11, 2001, that Wright had appeared on *CNN Crossfire,* and that there was additional news reporting about the allegations in a November 2002 article in the *Wall Street Journal.* A transcript of the *CNN Crossfire* interview and a copy of the November 2002 *Wall Street Journal* article are included in the record,[23] as is the transcript of Wright's May 2002 press conference.

Appellant argues that Wright, Vincent, and Flessner did not actually state that Appellant refused an "order" and that Defenbaugh and Timothy Gossfeld were clear that the decision was not Appellant's to make. Gossfeld was Wright's former supervisor in the Chicago FBI office. De-

---

20. Appellant testified that he first heard that ABC was going to do a story on him in the beginning of December 2002 because "[t]hey called the embassy and they wanted to do an on camera interview with me." He testified that the person who called was Richen, an ABC producer. Appellant testified that he told the ambassador, when asked about the situation, "[T]here's an agent with the FBI who is accusing me of refusing to wear recording and consensually monitoring a Muslim subject." He testified that he was unwilling to do an on camera interview because he was a certified undercover agent and did not want his picture to be broadcast.

21. Ross also indicated that "[t]he FBI's statement was false in several respects, including the reason for [Appellant's] refusal to record the Muslim suspect," but he did not state the basis for this opinion. Appellant testified that the statement contained an inaccuracy.

22. Vulgar Betrayal's mission was "to identify and neutralize through criminal process the HAMAS terrorist support organization located within the United States." Wright's June 1998 affidavit seeking civil asset forfeiture described the relationship of Yassin Kadi, Kadi International, and its related entity, BMI, Inc., of New Jersey, to terrorism suspects involved in a money-laundering scheme.

23. The *Wall Street Journal* article contains Wright's and Carmody's allegations and states that the allegations were first made in 2000 "in response to an internal discrimination complaint filed against the FBI by the Muslim agent, Gamal Abdel–Hafiz, then stationed in Dallas." The article indicates that Wright's affidavit in response to the internal complaint, including the allegation that Appellant refused to wear a hidden microphone and said that "[a] Muslim does not record another Muslim," was released by the FBI under the Freedom of Information Act.

fenbaugh was the special agent in charge of the Dallas FBI office in 1999. Appellant cites ABC's interview with Defenbaugh and the FBI press statement issued to ABC prior to publication to indicate that ABC was aware that the consensual monitoring decision and Appellant's role were determined by the Dallas FBI management. However, ABC's interview with Defenbaugh is not contained within the record and Defenbaugh testified only that he recalled a conversation with "possibly somebody from the media" and that he would never have said that it was Appellant's decision not to perform consensual monitoring. Ross testified that he did not know what the duties of a special agent in charge entailed, that Walter interviewed Defenbaugh, and that Walter might have reported to him what Defenbaugh said. However, the record does not indicate what, if anything, Walter reported to Ross.

In his response to ABC's motion, Appellant stated that Walter testified that he did not believe Wright or Vincent had authority to order Appellant to do anything; in his appellate brief, Appellant argues that Walter gave contradictory testimony about who could give orders to Appellant. However, the trial court sustained ABC's evidentiary objections pertaining to the portions of Walter's deposition relied upon by Appellant, and Appellant does not appeal these evidentiary rulings.

Walter, an ABC producer who had worked with Ross for over twenty years, stated in his affidavit that he had interviewed or participated in the interviewing of Wright, Vincent, Carmody, and Flessner and had found all of them to be credible. Walter testified that he contacted Defenbaugh a couple of days prior to the Broadcast. In response to the question, "So the answer is you don't know whose orders [Appellant] was supposed to follow?" Walter replied, "I know that we were told, I was told, that [Appellant] was told that he was required to participate in the investigation and he refused," and that it was Walter's understanding that being required was the same as being ordered. He testified that he was not saying that Wright or Vincent could require another agent to wear a wire, but that he thought, "[W]hen you are required or expected to wear the wire . . . and you refuse[,] that surmounts to refusal to follow an order." He explained that by "surmounts to refusal," he meant the equivalent of not following an order.

Therefore, although Defenbaugh testified that the special agent in charge of the field office to which a particular agent was assigned would have to approve a consensual monitoring request to use that agent, and that, in Appellant's case, he would have been the special agent responsible for such authorization, there is no evidence in the record that he actually conveyed this information to ABC. Although Gossfeld testified that the Chicago FBI office's initiative to have Appellant perform consensual monitoring was a "request[;] [i]t was not a command or a directive or an order," that the request would go to the Dallas FBI office, and that the Dallas office's management would make the decision, he also testified that no one from ABC or other media contacted him about Wright and Vincent's allegations.

The FBI's official statement is also vague with regard to the actual decision-making party or parties. The third paragraph addresses the "alleged refusal to wear a recording device," stating:

[Appellant] while assisting in an international terrorism investigation, was requested to meet with a subject of the investigation. Based upon his knowledge of the subject's background and the case, as well as the location of the meeting in a mosque, [Appellant] recom-

mended against, while suggesting an alternative plan. *Ultimately, the decision was made by management of the Dallas office and Chicago agreed to abide by that decision.* The Dallas Special Agent in Charge and other supervisors *concurred with [Appellant's] request not to conduct the consensual monitoring.* [Appellant] proposed to meet with the individual and testify in court to contents of the meeting, but the Chicago Division decided not to exercise that option. *The [Special Agent in Charge] advised that had the consensual monitoring been requested for any location other than a mosque, [Appellant] would have supported the proposal.* In addition, the Attorney General Guidelines regarding consensual monitoring forbid such investigative activity in a mosque or other place of worship in these circumstances. [Emphasis added.]

Appellant testified that the FBI's statement was inaccurate with regard to its assertion that the consensual monitoring was supposed to occur in a mosque.

While the FBI statement does indicate that the final decision was made by the Dallas FBI office, the language used with regard to Appellant, that he "request[ed] not to conduct the consensual monitoring," that the Dallas FBI office "concurred with [his] request," and that he "would have supported the proposal," indicates that Appellant had significant input into that final decision, even if he did not receive an order. The FBI statement does not mention "orders" at all. Michael Resnick, a supervisory special agent with FBI headquarters, testified that, theoretically, anyone in Appellant's chain of command had the authority to order Appellant to surreptitiously record another person, but that Wright and Flessner would not have had such authority. There is no evidence in the record that Resnick conveyed this information to ABC.

Although Appellant asserts that Wright, Vincent, and Flessner did not actually state that Appellant refused an "order," and the record reflects that they did not mention "orders" at all during their interviews, Ross stated in his affidavit that:

> We were told that [Appellant's] refusal to secretly record Muslim suspects was an act of insubordination and that his refusal based on religious reasons was "not an agent's option" that an FBI agent "doesn't have that choice" and that "it's not permitted." We were told that [Appellant's] refusal was unprecedented in the considerable experience of agents Wright, Carmody, Vincent, and the lead prosecutor, Assistant U.S. Attorney Flessner.

We have reviewed the ABC interviews with Wright,[24] Carmody,[25] Vincent,[26] and

---

24. Wright, who had been with the FBI for twelve years at the time of the interview, told Ross during his ABC interview that a supervisor from FBI Headquarters had yelled at him, forbidding him to open criminal investigations against intelligence subjects and that Headquarters' policy was not to arrest terrorists, but to watch them. He did not mention FBI hierarchy, other than to refer to supervisors, headquarters, and the agency bureaucracy in general. He attempted to explain to Ross how the FBI was separated into two sides—criminal and intelligence.

He told Ross that a Muslim FBI agent in Dallas contacted him, told him that the presi-

dent from a company that Wright was investigating wanted to meet with the Muslim agent to discuss Wright's investigation, and asked Wright if he should meet with him. When the Muslim agent was asked to wear a wire, he put forth "considerable resistance," and said "a Muslim doesn't record another Muslim." Wright told Ross that Appellant's response "floored" him and that he was convinced that Appellant would be fired, describing his reaction to Ross as, "[t]here is no way in hell that you're going to remain as an FBI agent after what you just did." Wright told Ross that he called FBI Headquarters, and the Headquar-

Flessner,[27] as well as the supporting docu-

ters supervisor said, "Well, you have to understand where he's coming from, Bob." Wright described his response, saying, "We both took the same damn oath to defend this country against all enemies foreign and domestic, and he just said no? No way in hell."

Wright told Ross that instead of being fired, Appellant filed a complaint against Wright for questioning his loyalty to the United States. Wright told Ross that he told the EEOC counselor, "[I]f you think for two seconds I'm gonna apologize to this guy because he's refusing to do his job, no way in hell is that going to happen." Wright told Ross that he was glad that he had been investigated because he had a signed and sworn statement that he could go public with under the Freedom of Information Act. Wright testified that he did not tell ABC anything that was false.

25. Carmody, a retired thirty-four-year veteran special agent with the FBI, told ABC that Appellant refused to record a conversation with a suspect that the Tampa FBI office and the Tampa U.S. Attorney's office wanted recorded, although Appellant was willing to make the telephone call to the suspect, and that he reported Appellant "to the FBI [headquarters] and also to [Appellant's] superiors in Dallas, for his refusal to cooperate in an official criminal investigation." Carmody told ABC that he "was shocked that an agent would not do his duty" and that "it's hard to conceive that the FBI . . . would tolerate such behavior by an agent." Carmody asserted, "[A]n FBI agent has the duty to enforce the law, and if he refuses to do so, he should not be an agent." Carmody also stated that, up until then, "I'd never heard an agent refuse to do his duty," and that he felt that "that was insubordination, and it should be reported to his superiors."

Carmody did mention that the Tampa U.S. Attorney's office was aware that using Appellant "would have to be coordinated with the U.S. Attorney's office in Dallas as well as the FBI," that he reported Appellant's refusal to Appellant's Dallas superiors, and that Carmody and the Tampa FBI office could not discipline Appellant, but there is nothing in Carmody's interview and affidavit to explain to ABC the FBI hierarchy involved in giving Appellant an "order." Carmody stated in his affidavit that everything he communicated to ABC in its December 2002 interview with him was true.

26. Vincent, who had been with the FBI for twenty-seven years, referred to the "upper echelons of management" at the FBI but did not specify who was in charge of whom and also stated that "there are a lot of holes in the FBI management that need to be corrected." Vincent also said that FBI Headquarters could not admit to being wrong.

Vincent told Ross that, with regard to Appellant, who was referred to in the interview as the Muslim FBI agent, and wearing a wire, Appellant "said it was a cultural thing. And on top of that, that a Muslim did not record another Muslim." Vincent told Ross that this was "unheard of. . . . [Y]ou do your job first." Vincent said that he inquired into how to file a dereliction of duty complaint and that Headquarters never responded. Vincent testified that he did not tell ABC anything that was false.

27. Flessner, who had been a federal prosecutor in the Chicago office of the Department of Justice for twelve years, told ABC during his interview that the FBI was there to assist the prosecutors and that the FBI's function is "to investigate and prosecute crimes." He said, with regard to the alleged refusal by Appellant to wear a wire, "the agent refused . . . based on religious reasons . . . what he said was, it was against his religion to record another Muslim. I was dumbfounded by that response." Flessner also told ABC, "it's not an agent's option to decide[] not to pursue a criminal investigation . . . they don't have that choice. When they are told to assist in a criminal investigation, that's what they do. It's not . . . an organization that allows for philosophical differences." Flessner did not elaborate on who had the authority to tell an agent to assist in a criminal investigation. Flessner referred to "powers" bigger than he was in the Justice Department and within the FBI but did not explain the management structure.

Flessner told ABC, "[I]n my experience in more than twelve years I have never known an agent to say, I will not participate in this investigation. . . . I think if you ask any agent on the street they would say that that refusal is just unheard of. It's not permitted." He told ABC that the opportunity to record the suspect was "a huge break in the investigation[,] [b]ut ultimately it didn't pan out to anything because of the agent's refusal to

mentation that Ross referenced; [28] all of these assertions are supported in the record. Combined with Walter's testimony, that he interpreted as being expected to wear a wire as the equivalent of an order, the record indicates that Ross and Walter believed when Broadcast Statement One was published that Appellant had refused an order, even if they were mistaken. There is nothing in the record to show that either Ross and Walter doubted the truth of Broadcast Statement One or that either one informed Gibson of such doubt.

To prove malice, the plaintiff must offer proof of the defendant's state of mind at the time of publication. *See Skeen*, 159 S.W.3d at 637; *New Times, Inc.*, 146 S.W.3d at 162; *see also Foster v. Upchurch*, 624 S.W.2d 564, 566 (Tex.1981) ("It is not enough for a plaintiff to show that the defendant made a mistake."); *Gonzales v. Hearst Corp.*, 930 S.W.2d 275, 277 (Tex.App.-Houston [14th Dist.] 1996, no writ) (stating that showing defendant made a mistake or erred in judgment is not enough to prove actual malice without also showing defendant's state of mind).

cooperate." Flessner said that he had assumed that Appellant would have been sanctioned in some way, but that he later found out nothing happened. Flessner reiterated, "[A]n FBI agent's job is not to decide not to pursue an investigation.... [T]hat's simply not their job.... [T]heir responsibility is to investigate and prosecute criminal offenses."

Flessner testified that he did not say anything false in his interview. He also testified that the prosecutor "would ultimately make the call as to how the investigation was being directed in order to prove the case," that he was the lead prosecutor in operation Vulgar Betrayal, and that Wright was the lead FBI investigator in *that* operation. He also testified that the relationship between the prosecutor's office and the FBI was not hierarchical and that he did "not have a pure authority to order anybody in the FBI to do anything," but that on every occasion that he could recall, when he instructed FBI agents "to conduct certain parts of certain investigations to prove the case, and every case *that was complied with* that I have—to repeat myself, I have no memory of ever having an FBI agent refuse a request to pursue an investigative lead." [Emphasis added.]

Flessner testified that, in his entire experience with the Department of Justice, "I had never heard, nor was I ever aware, nor did I experience with the exception of this case an agent refusing to participate in an assignment or investigation for some religious or philosophical reason. It was just not an option that was ever communicated to me in any way."

28. During the Judicial Watch press conference covered by C–Span, Wright referred to incompetency and intentional obstruction of justice by "FBI management." Part of Wright's EEOC statement was read during the press conference, including that the Dallas special agent stated what he would and would not do, including that "he would only record the individual if he told him that he was wearing a wire," that he feared for his safety, that he did not trust the FBI to protect him, and that he stated, "[a] Muslim does not record another Muslim." Carmody's sworn declaration about his incident with Appellant was also read during the press conference.

In Wright's EEOC statement, Wright asserted that after the teleconference with Appellant, he called FBI headquarters and explained what had happened and that they "had both taken the same oath and this was [Appellant's] duty." He also referred to a conversation that he had with a special agent in another office about "the problems I was having getting [Appellant] to wear a wire."

In the *CNN Crossfire* interview, Wright stated that he stood by his statement and that his concern was that "this individual was working international terrorism investigations and was refusing to do the sworn duty that he swore he would do." In the *Wall Street Journal* article, Wright alleged that Appellant "refused to cooperate." Wright's 1999 performance evaluation reflects that he was assigned to international terrorism and that his performance was "exceptional." Wright's June 1998 civil asset forfeiture affidavit described the relationship of Yassin Kadi, Kadi International, and BMI, Inc. to terrorism suspects involved in a money-laundering scheme.

The plaintiff must present some evidence that the defendant purposefully published mistaken facts or that the circumstances were "so improbable that only a reckless publisher would have made the mistake." *Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 855 (Tex.2005). Evidence that a report was mistaken, even negligently so, is not evidence of actual malice. *Id.; Turner*, 38 S.W.3d at 120 ("A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading."). Because a poor choice of words, without any showing to indicate that the authors thought they were making a false statement or at least had serious doubts about its truth, does not create a genuine issue of material fact with regard to actual malice, we overrule this portion of Appellant's first issue with regard to Broadcast Statement One. *See Cantu*, 168 S.W.3d at 855; *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 174 (Tex.2003).

*Wright's Remaining Statements* (Part of Broadcast Statement Two, Broadcast Statement Three, and Article Statements One through Three)

Having reviewed Ross and Walter's affidavits and depositions, as well as all of the interviews and documents referenced by Ross in his affidavit, we likewise conclude that there is no evidence in the record to show that Ross and Walter, as ABC's representatives, did not believe that Wright was telling the truth or had serious doubts about whether Wright was telling the truth when Wright made the challenged statements attributed to him in the Broadcast and the Article. *See Skeen*, 159 S.W.3d at 637. Therefore, we overrule this portion of Appellant's first issue as it pertains to Wright's remaining statements.

*Ross' Statements* (Part of Broadcast Statement Two, Broadcast Statement Four)

With regard to Broadcast Statement Two, Flessner told Ross that, concerning the 1999 Kadi investigation and the consensual monitoring issue, "It was a key link. It was a ... huge break in the investigation. But ultimately it didn't pan out to anything because of the ... agent's refusal to cooperate." Wright stated in his EEOC statement that Appellant stated that he "would only record the individual if he told him he was wearing a wire." Wright described the relationship between Yassin Kadi and the company the suspect worked for in his 1998 civil asset forfeiture affidavit.

With regard to Broadcast Statement Four, when asked what he expected to happen to the Muslim agent after the refusal, Flessner informed Ross that "[he] assumed he would have been ... sanctioned in some way," but, instead, found out that nothing happened. Vincent told Ross during his interview that Appellant's alleged refusal was "unheard of." Wright told Ross that he "was floored" by Appellant's response and anticipated that Appellant would be fired, saying that he thought, after the alleged refusal, that "[t]here is no way in hell that [Appellant would] remain as an FBI agent after what [he] just did." In his ABC interview, Carmody expressed his consternation that Appellant had, instead, attained an FBI position at the U.S. Embassy in Saudi Arabia.

█ There is no evidence in the record to indicate that Ross disbelieved Wright, Flessner, or Carmody, or that he had serious doubts about the truth of Broadcast Statements Two and Four when he made them. *See Skeen*, 159 S.W.3d at 637. Therefore, we overrule Appellant's first issue as it pertains to Broadcast Statements Two and Four.

*November Article*

 Appellant challenged two phrases from ABC's November Article, listing them as "... allegations that a Muslim FBI agent may have thwarted the investigation two years before September 11, 2001," and "Gamal Abdel–Hafiz, a Muslim FBI Agent, *refused to cooperate with an FBI probe into BMI, Inc.,...*." The full statements, with the challenged portions in bold, are:

> An FBI affidavit, obtained by AB-CNEWS, contains details of the aborted investigation of al-Kadi, including his ownership of a suspicious chemical plant in suburban Chicago and **allegations that a Muslim FBI agent may have thwarted the investigation two years before the [sic] Sept. 11, 2001.**

> According to the *Wall Street Journal* today, in an affidavit dated March 21, 2000, an FBI agent from the organization's Chicago counterterrorism squad alleged that **Gamal Abdel–Hafiz, a Muslim FBI Agent, refused to cooperate with an FBI probe into BMI Inc.,** a now defunct Secaucus, N.J., company currently under U.S. investigation in the probe of al-Kadi.

Wright's 1998 civil asset forfeiture affidavit and his EEOC statement contain the information in the first statement. The November 26, 2002 *Wall Street Journal* article contained the following information:

> Robert Wright of the FBI's Chicago counterterrorism squad responded [to Appellant's internal complaint] with an 11–page affidavit dated March 21, 2000, that ... alleged that [Appellant] refused to cooperate with an FBI probe into BMI Inc., a now-defunct Secaucus, N.J., company that figures in government investigations of Yassin Qadi, a Saudi businessman whom the U.S. government says is a supporter of terrorism.

Appellant testified at the special appearance hearing that he had chosen not to sue the *Wall Street Journal* "because ... they attributed everything to somebody." [29]

Ross stated that he helped write the November Article, that it reported, in part, on the allegations in the *Wall Street Journal* article of the same date, November 26, 2002, and that at the time of publication, he believed all of the statements in the November Article to be true and entertained no doubts about their truth. There is no evidence in the record to show that ABC published these statements with actual malice. As discussed above, there is no evidence in the record to show that ABC knew, with regard to Wright's affidavits or with regard to the *Wall Street Journal* article, that the information was false or that it had serious doubts about the information at the time of publication. *See Skeen*, 159 S.W.3d at 637. We overrule this portion of Appellant's first issue.

**(2) Choice Of Material And Juxtaposition**

Appellant argues that ABC chose its material with actual malice and that the omission of material facts and the juxtaposition of facts in a material way rendered the gist of the Broadcast and Article false.

Appellant's assertions with regard to the omission and juxtaposition of information in the Broadcast are more akin to editorial choices than deliberate defamation. *See Huckabee*, 19 S.W.3d at 425–26 (holding that a media defendant's "omission of facts may be actionable if it so distorts the [viewers'] perception that they receive a substantially false impression of the

---

**29.** The trial court granted ABC's motion to file supplemental summary judgment evidence in the form of portions of the testimony from the special appearance hearing. Appellant testified at that hearing that he did not sue Carmody or the *Wall Street Journal*.

event"); *see also Turner,* 38 S.W.3d at 116 ("Like a statement of opinion, a publication may by omission or misleading juxtaposition connote false facts even though it does not state them directly.")

For a public figure to demonstrate that a defendant's editorial choices constitute actual malice, he must present evidence that the defendant was aware that these choices could create a substantially false impression. *See Huckabee,* 19 S.W.3d at 426 (stating that the plaintiff could satisfy this test with evidence that defendant selectively omitted facts to purposefully create false portrayal of events). If the omission of certain facts does not grossly distort the story, then the defendant's "failure to capture accurately all the story's details suggests [only] an error in judgment, which is no evidence of actual malice." *Id.* Additionally, evidence that a broadcast was created "from a particular point of view, even when [it is] hard-hitting or sensationalistic, is no evidence of actual malice." *See id.* at 425.

There is no doubt that ABC's Broadcast was sensationalistic—filled with language like "explosive allegations," "astounding," "a complete lie." However, the question here is: is there any evidence that ABC decided to omit portions of the FBI press statement and to arrange the portions of the interviews, photos, and videos it used with actual malice, that is, with awareness the omitted or juxtaposed materials could create a substantially false impression of Appellant? *See id.* at 426. We have already discussed the research and development conducted by ABC with regard to the Broadcast and the Article and concluded that there was no evidence that ABC published the contested statements with actual malice. We now consider that evidence in light of the arrangement and selection of the information contained within the Broadcast.

The Broadcast's theme was "a story the FBI did not want told," presented by "two agents step[ping] out of the shadows to tell what they know," about FBI problems investigating terrorism pre–9/11. The report chronicled Wright and Vincent's investigation in the mid–1990s with regard to a terrorist cell in Chicago; the connection between that cell, Yassin Kadi, and the American Embassy bombings by al-Qaeda in Africa in 1998; how Appellant's alleged refusal to tape "one of Kadi's suspected associates" affected that investigation; how FBI headquarters, through apathy or for other reasons, prevented Wright and Vincent from continuing their investigation; and Wright and Vincent's responses to 9/11 and its connection to Kadi. The report also included Kadi's response to allegations that he was connected to Osama bin Laden or al-Qaeda.

Appellant contends that ABC's decision to juxtapose the allegations involving Appellant between Mr. Flessner's statements regarding mistakes possibly costing lives, and a photo and voice over regarding the World Trade Center attack creates a deliberately false impression in light of Mr. Flessner's statements that he could not say that the Chicago investigation would have impacted the September 11, 2001 terrorist attacks.

He also argues that ABC "literally placed the allegations about Appellant 'side by side' with the video image and voice over regarding the September 11th terrorist attacks," such that the "inevitable conclusion that one draws from the Broadcast is that Appellant's alleged conduct led to the September 11th terrorist attacks."

However, it is clear in the chronology of the Broadcast that Flessner's statement refers to the 1998 embassy bombings discussed immediately before his comment.

Ross states in that segment of the story that the bombings killed more than two hundred people. While the next segment of the story does pertain to Appellant, it begins with the allegations by Flessner and Wright about Appellant's involvement in "the investigation." The first segment of the story introduces Wright and Vincent's assignment, to "track a connection to Chicago, a suspected terrorist cell that would later lead them to an Osama bin Laden connection." The connection referred to is Kadi, first named in the embassy bombing segment, and the "damage" referred to, with regard to Appellant and the story, is that Appellant "[told] Wright and Vincent he would refuse to secretly record one of Kadi's suspected associates who was also a Muslim." 9/11, and the photo of the second plane approaching the already-smoking Twin Towers, is not mentioned until the final segment, with regard the FBI's "decision to kill [Wright's] case."

While there is a connection to Appellant in that he is mentioned in the same broadcast as Kadi, who was linked to 9/11 and al-Qaeda in the Broadcast, the overarching theme is of *FBI* incompetence, rather than *Appellant's* actions or inaction. The story segment immediately before the photo of the Twin Towers addresses Wright's supervisor's response to his protest of the FBI decision to "kill his case." The supervisor's response, in January 2001, was "I think it's just better to let sleeping dogs lie." Wright then states, to the camera, "[t]hose dogs weren't sleeping. They were training, they were getting ready." The next scene is of the Twin Towers, with Ross' voice over about September 11, and how, one month later, the U.S. government "officially identified Yassin Kadi as one of Osama bin Laden's important financiers, a specially designated global terrorist."

A party cannot avoid summary judgment by relying on circumstantial evidence that is equally consistent with the nonexistence of the fact the party seeks to prove. *Soodeen v. Rychel,* 802 S.W.2d 361, 363 (Tex.App.-Houston [1st Dist.] 1990, writ denied); *see also Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex. 1997) (holding "meager circumstantial evidence" that could give rise to any number of inferences, none more probable than another, is no evidence of an ultimate fact issue). In light of Wright and Vincent's statements during the interview and all of the materials reviewed by Ross and Walter prior to publication, and bearing in mind that a publisher's presentation of facts may be misleading but still not constitute a "calculated falsehood" unless the publisher knows or strongly suspects that it is misleading, and considering the totality of the story presented by ABC in its Broadcast, there is no evidence in the record to support Appellant's contention that ABC deliberately omitted or juxtaposed the information in the Broadcast in order to present a substantially false impression of Appellant. *See Turner,* 38 S.W.3d at 120; *Huckabee,* 19 S.W.3d at 426. Therefore, we overrule the remainder of Appellant's first issues.[30]

## CONCLUSION

Because we have overruled all of Appellant's issues, we affirm the judgment of the trial court.

**30.** We do not reach Appellant's remaining arguments. *See* Tex.R.App. P. 47.1.